Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Jennifer Abreu, Esq.
Vincent J. Pontrello, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                               Plaintiffs,

        -against-

JMD PHARMACY, INC., RONIKA SONI, APP
PHARMACY, INC. d/b/a JMD PHARMACY, APRX
PHARMACY INC. d/b/a JMD PHARMACY and JOHN
DOES NOS. 1 -5.

                               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.: _____(        )

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, JMD Pharmacy, Inc., Ronika Soni,

APP Pharmacy, Inc. d/b/a JMD Pharmacy, APRX Pharmacy Inc. d/b/a JMD Pharmacy, and John

Does Nos. 1-5 (collectively, "Defendants"), hereby allege as follows:

1.      This action seeks to terminate an on-going fraudulent scheme perpetrated by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $800,000.00 in fraudulent pharmaceutical billing to GEICO. Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent charges to GEICO seeking payment for a set of specifically targeted, medically unnecessary "pain relieving" topical prescription drug products, including topical compounded pain creams and topical pain gels, lotions, ointments, and pain patches (collectively, the "Fraudulent Topical Pain Products"), as well as various other prescription drug medications (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.      The Defendants used JMD Pharmacy, Inc, owned as of record by Ronika Soni ('Soni"), to collect from GEICO and other New York automobile insurers on the fraudulent billing for the Fraudulent Pharmaceuticals, which were purportedly dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").  To effectuate and conceal their scheme, the Defendants used multiple tax identification numbers with the same or similar pharmacy name (*i.e*, "JMD Pharmacy" or "JMD RX") in order to bill for the Fraudulent Pharmaceuticals.

3.      The Defendants, while ignoring their obligations to comply with pharmacy and other licensing laws in the State of New York, targeted the prescription and dispensing of prescription pharmaceutical products with exorbitant charges, which products were dispensed in place of other effective, but much-less costly prescription and non-prescription drug products.  The Defendants' scheme initially centered around JMD Pharmacy, Inc.'s production and dispensing of large volumes of Fraudulent Topical Pain Products in the form of compounded pain creams in set formulations, which were not approved by the United States Food and Drug Administration

("FDA"), and were dispensed without complying with state and federal licensing requirements. The Defendants' billing for the compounded pain creams typically ranged from $3,971.76 to $4,306.82 for a single tube. Thereafter, beginning in December 2020, the Defendants targeted Fraudulent Topical Pain Products in the form of Lidocaine 5% Ointment and Pennsaid External Solution 2%.  The Defendants' billing for these topical pain products was typically $1,223.00 for a s single tube of Lidocaine 5% Ointment and $2,631.40 for a single tube of Pennsaid External Solution 2%.

4.      Defendant JMD Pharmacy, Inc., though continuing to seek collection on the Fraudulent Billing submitted under the names of "JMD Pharmacy" and "JMD RX", transferred its license away to other entities with similar-sounding names.  Notably, a significant portion of the billing submitted on behalf of JMD Pharmacy, Inc. to GEICO is for pharmaceutical products purportedly dispensed to Insureds after JMD Pharmacy, Inc. ceased being actively registered with the New York State Department of Education as a pharmacy.

5.      In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with various prescribing healthcare providers (the "Prescribing Providers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"). Pursuant to these collusive agreements, in exchange for kickbacks or other financial incentives, the Defendants steered the Prescribing Providers and Clinic Controllers to direct large volumes of prescriptions for the Fraudulent Pharmaceuticals to JMD Pharmacy, Inc.

6.      By this action, GEICO seeks to recover more than $377,000.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to the Pharmacies of over $428,000.00 in pending fraudulent No-Fault claims for the Fraudulent

Pharmaceuticals that the Defendants submitted or caused to be submitted through the pharmacies because:

(i)     The Defendants billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

(ii)     The Defendants dispensed and billed for Fraudulent Pharmaceuticals after JMD Pharmacy, Inc. ceased being registered as a licensed pharmacy;

(iii)     The Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to JMD Pharmacy, Inc. and/or its successors inn interest in exchange for unlawful kickbacks and other financial incentives;

(iv)     The Defendants engaged in illegal bulk compounding by having JMD Pharmacy, Inc. specialize in producing and dispensing large quantities of compounded pain creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault benefits;

(v)     The Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and dispensed in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and

(vi)     The Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of JMD Pharmacy, Inc. and similar variations of that name pursuant to illegal, invalid, and duplicitous prescriptions.

7.     The Defendants' scheme began in February 2017 and continues to date as JMD Pharmacy, Inc. continues to attempt collection on the billing for the Fraudulent Pharmaceuticals.

8.     As discussed more fully below, the Defendants at all times have known that: (i) the Defendants billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care; (ii) the Defendants dispensed and billed for

Fraudulent Pharmaceuticals after JMD Pharmacy, Inc. ceased being registered as a licensed pharmacy; (iii) the Defendants participated in illegal, collusive relationships to direct illegal prescriptions for the Fraudulent Pharmaceuticals to JMD Pharmacy, Inc., in exchange for unlawful kickbacks and other financial incentives; (iv) the Defendant engaged in illegal bulk compounding; (v) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and (vi) the Defendants submitted charges for the Fraudulent Pharmaceuticals under the name of JMD Pharmacy, Inc. pursuant to illegal, invalid, and duplicitous prescriptions.

9.      Based on the foregoing, neither JMD Pharmacy, Inc., nor its successors in interest, have  ever had the right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail.  As a result of the Defendants' scheme, GEICO has incurred damages of approximately $377,000.00.

## THE PARTIES

### I.      Plaintiffs

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

II.    **Defendants**

11.    Defendant JMD Pharmacy, Inc. is a New York corporation, formed on or about March 28, 2016, with its principal place of business at 58-09 Woodside Avenue, Woodside, New York.

12.    JMD Pharmacy, Inc. was registered with New York State as a pharmacy from May 12, 2016 to January 18, 2019.

13.    JMD Pharmacy, Inc. was never registered as a manufacturer or outsourcing facility and was never permitted to engage in bulk drug compounding or to specialize in dispensing large quantities of compounded pain creams that are not specifically tailored to the unique needs of individual patients.

14.    Defendant Soni resides in and is a citizen of Texas. Soni is the record owner of JMD Pharmacy, Inc.

15.    APP Pharmacy, Inc. d/b/a JMD Pharmacy is a New York corporation, formed on or about November 1, 2018, with its principal place of business at 58-09 Woodside Avenue, Woodside, New York.

16.    APP Pharmacy, Inc. d/b/a JMD Pharmacy is the successor in interest to JMD Pharmacy, Inc. and was the recipient of JMD Pharmacy, Inc's pharmacy license transfer.

17.    APRX Pharmacy Inc. d/b/a JMD Pharmacy is a New York corporation, formed on or about April 20, 2020, with its principal place of business at 58-09 Woodside Avenue, Woodside, New York.

18.    APRX Pharmacy Inc. d/b/a JMD Pharmacy is the successor in interest to APP Pharmacy, Inc. d/b/a JMD Pharmacy and was the recipient of APP Pharmacy, Inc. d/b/a JMD Pharmacy's pharmacy license transfer.

19.     JMD Pharmacy, Inc. and its successors in interest are connected to other pharmacies suspected of engaging in a similar fraud scheme, including JP RX Corp. ("JP RX") and Maccabi Pharmacy Rx, Inc. ("Maccabi").   Both JP RX and Maccabi were identified in a criminal indictment filed in the Eastern District of New York involving a large-scale insurance fraud scheme related to pharmaceutical products, which scheme was spearheaded by Peter Khaim and Arkadiy Khaimov according to the U.S. Attorney. See United States of America v. Khaim, et al., 1:20-cr-00580(AMD)(RML) (E.D.N.Y. 2020).  Significantly, the name "Peter Khaim" appears on the fax header of several bills that were faxed to GEICO on behalf of JMD Pharmacy, Inc.

20.     John Does Nos. "1" through "5" are persons and entities, presently not identifiable, who are not and never have been licensed healthcare professionals but who, along with Soni, participated in the operation and control of JMD Pharmacy, Inc. and its successors in interest and facilitated the illegal, collusive relationships with the Prescribing Providers and the Clinic Controllers.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

22.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331, over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

23.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

24.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of New York's No-Fault Laws

25.     GEICO underwrites automobile insurance in the State of New York.

26.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

27.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

28.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

8

29.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

30.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

31.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

32.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    An Overview of Applicable Licensing Laws

33.     Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons

for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

34.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

35.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

36.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

37.     New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

38.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

39.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

40.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

41.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

42.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

### III.     An Overview of Compounded Drug Products and Topical Pain Products

43.     The United States Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the United States Food and Drug Administration ("FDA") to oversee the safety of food, drugs, and cosmetics.

44.     The FDA strictly regulates over-the-counter and prescription drugs and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

45.     FDA-approved drugs require: (i) approval prior to marketing; (ii) compliance with federal labelling laws; and (iii) that the drugs be made and tested in accordance with good manufacturing practice regulations (GMPs), which are federal statutes that govern the production and testing of pharmaceutical products.

46.     Compounded drugs are not FDA-approved, though they may include FDA-approved drugs, and are generally exempt from the FDA approval process which applies to new drugs -- but only under limited circumstances.  See 21 U.S.C. § 353a.

47.     In particular, pursuant to Section 503A of the Federal Food, Drug and Cosmetic Act ("FDCA"), as amended by the Compounding Quality Act, the laws applicable to drugs regulated by the FDA, including the laws relating to the safe manufacturing of drugs, generally do not apply to a "compounded" drug product: (1) if the drug product is compounded for an identified individual patient based on the receipt of a valid prescription order that a compounded product is necessary for the identified patient, and (2) if the compounding is performed by a licensed pharmacist in a state licensed pharmacy.

48.     The FDA has publicly expressed concern regarding large-scale drug manufacturing under the guise of traditional small-scale pharmacy compounding.  For example, the FDA has noted that poor practices on the part of bulk drug compounders can result in contamination or products that do not possess the strength, quality, and purity required. Published reports also consistently show that compounded drugs fail to meet specifications at a considerably higher rate than FDA-approved drugs.

49.     The prescription of compounded drug products and ensuing billing to both private and public insurers also has been the subject of state and federal investigations, litigation, and reports due to increased concerns regarding fraud.

50.     The U.S. Department of Health & Human Services and the U.S. Postal Service have both issued reports documenting fraud concerns with compounded drugs. See High Part D Spending on Opioids and Substantial Growth in Compound Drugs Raise Concerns, HHS OIG Data

Brief, OEI-16-00290 (June 2016); <u>Worker's Compensation Compound Drug Costs, Management Advisory</u>, Report No. HR-MA-16-003 (March 14, 2016).

51.     Further, there have been numerous criminal proceedings commenced in connection with compounded drug products.  See <u>e.g.</u>, <u>USA v. Kleyman</u>, 1:14-CR-598-JHR, Docket No. 1; <u>USA v. Cesario</u>, 3:16-CR-060-M, Docket Nos. 3, 75; <u>USA v. Baldizzi</u>, 8:16-CR-271-MSS-AEP, Docket No. 1; <u>USA v. Parrello</u>, 16 Crim. 522 (2016); and <u>USA v. Bell</u>, 8:20-CR-00018-JVS, Docket No. 1.

52.     As a result of the investigation, litigation, and scrutiny of fraudulent billing for compounded drug products, many fraudulent pharmacies moved away from billing for compounded drug products and thereafter focused on topical pain creams, most notably prescription strength Diclofenac and Lidocaine products.

53.     There are many over the counter topical pain medications available, but because the No-Fault Laws limit reimbursement for benefits to prescription drugs only, fraudulent pharmacies and fraudulent prescribers have focused on prescription strength topical products with exorbitant charges, prescribing and dispensing them in place of other effective, less costly pharmaceuticals.

54.     Not surprisingly, the Office of the Inspector General of the U.S. Department of Health and Human Services noted that Diclofenac and Lidocaine have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing.  <u>See Questionable Billing For Compounded Topical Drugs in Medicare Part D</u>, OEI-02-16-00440 (August 2018). This report also noted that many pharmacies in New York State are among the most questionable in the nation.

**IV.    The Defendants' Scheme Involving the Fraudulent Pharmaceuticals**

**A.    Overview of the Scheme**

55.    Beginning in February 2017, the Defendants masterminded and implemented a fraudulent scheme in which they used JMD Pharmacy, Inc. to exploit patients for financial gain by billing the New York automobile insurance industry for hundreds of thousands of dollars in exorbitant charges relating to the Fraudulent Pharmaceuticals purportedly provided to the Insureds.

56.    JMD Pharmacy, Inc. purported to be a storefront neighborhood pharmacy operating in Queens County, New York but instead operated as part of a large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally ignoring a vast array of prescription and over-the-counter ("OTC") medications readily available at a fraction of the cost.

57.    Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, JMD Pharmacy, Inc.'s business was largely focused on a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products).

58.    JMD Pharmacy, Inc.'s charges for the Fraudulent Topical Pain Products have amounted to more than 95% of the charges that Defendants submitted to GEICO for reimbursement, and have resulted in billing to GEICO alone of over $800,000.00.

59.    Beginning in February 2017, the Defendants' scheme initially centered around JMD Pharmacy, Inc.'s mass production and dispensing of topical compounded pain creams in set formulations (the "Fraudulent Compounded Pain Creams"), billing more than $360,000.00 for these compounded drug products.

60.     JMD Pharmacy, Inc. submitted voluminous billing for the Fraudulent Compounded Pain Creams, which were not approved by the FDA, without tailoring the medications to the individual needs of any individual patient and without complying with state and federal licensing requirements designed to ensure the quality, safety, and effectiveness of mass-produced drug products.

61.     JMD Pharmacy, Inc., in fact, produced the Fraudulent Compounded Pain Creams in bulk by assembling combinations of multiple drug ingredients with unproven effects in order to create exorbitantly priced products to financially enrich themselves rather than to treat or otherwise benefit the Insureds who purportedly received them.   The more ingredients the Defendants included in a Fraudulent Compounded Pain Cream, the more they could inflate the charges they could submit to GEICO and other insurers as compounded drug products are billed per ingredient.

62.     The scheme by the Defendants to routinely manufacture and dispense large volumes of the Fraudulent Compounded Pain Creams pursuant to their collusive arrangements with the Prescribing Providers and Clinic Controllers egregiously inflated the charges submitted to GEICO.   For example, billing from the Defendants typically ranged from $3,971.76 to $4,306.82 for a single tube of a Fraudulent Compounded Pain Cream.

63.     In November 2017, the Defendants abruptly ceased manufacturing, dispensing and billing for Fraudulent Compounded Pain Creams through JMD Pharmacy, Inc. – likely due to increased scrutiny and litigation against pharmacies by federally funded healthcare programs (i.e., Medicaid and Medicare) and private insurers seeking to combat pervasive insurance fraud based on the fraudulent prescription, dispensing, and billing practices associated with compounded drugs.  JMD Pharmacy, Inc. did not bill GEICO for any other medications from November 2017 until December 2020.

64.     Thereafter, in December 2020, the Defendants began billing for other specifically targeted Fraudulent Topical Pain Products, exclusively in the form of topical Lidocaine 5% Ointment and Pennsaid External Solution 2% (the "Non-Compounded Fraudulent Topical Pain Products"), along with certain other products such naproxen and cyclobenzaprine. In fact, each Insured received the exact same set of Non-Compounded Fraudulent Topical Pain Products from JMD Pharmacy, Inc.  The Defendants commenced billing for these specifically targeted products because they could acquire them at low cost and dispense and bill for them at egregious prices.

65.     As with the Fraudulent Compounded Pain Creams, the Defendants' scheme to steer the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to JMD Pharmacy, Inc. for large volumes of the Fraudulent Topical Pain Products Non-Compounded Fraudulent Topical Pain Products also egregiously inflated the charges submitted to GEICO.  For example, JMD Pharmacy, Inc. typically billed $1,223.00 for a single tube of Lidocaine 5% Ointment and $2,631.40 for a single tube of Pennsaid External Solution 2%.

66.     When the Defendants began submitting billing to GEICO in December 2020, they initially used the name "JMD RX" with the same post office box address and delivery slips as JMD Pharmacy, Inc., but utilizing a different tax identification number.  However, in response to GEICO's inquiry, GEICO was advised in writing by the purported billing department for "JMD Pharmacy" that the name of the pharmacy was incorrectly entered into their billing system and that the actual name of the pharmacy was JMD Pharmacy, Inc.

67.     GEICO also received revised billing containing the name JMD Pharmacy, Inc. (rather than JMD RX), along with a W-9 Request for Taxpayer Identification Number and Certification for JMD Pharmacy, Inc, listing the address of the pharmacy as 58-09 Woodside Avenue, Woodside, New York.

68.     Further, JMD Pharmacy, Inc. is currently prosecuting litigation and arbitrations against GEICO and other New York insurers for billing submitted under the name "JMD RX" asserting that JMD Pharmacy, Inc. is entitled to reimbursement for these claims under the No-Fault regulations.

69.     JMD Pharmacy, Inc. transferred its pharmacy license away on or about January 18, 2019.

70.     Despite the transfer of JMD Pharmacy, Inc.'s pharmacy license, the Defendants ignored corporate formalities and their obligations to comply with pharmacy and other licensing laws in the State of New York and instead represented to GEICO that the billing being submitted in 2020 and beyond was from JMD Pharmacy, Inc.  The Defendants did so as they were simply concerned with exploiting the Insureds for financial gain and continuing their fraudulent scheme.

71.     As a further part of fraudulent scheme, the Defendants entered into illegal, collusive agreements with the Prescribing Providers and the Clinic Controllers and steered them to prescribe and direct large volumes of prescriptions to JMD Pharmacy, Inc. for the targeted set of Fraudulent Topical Pain Products, purportedly to treat patients at various No-Fault Clinics.

72.     The Defendants, in exchange for the payment of kickbacks, received medically unnecessary prescriptions from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols.

73.     In keeping with the fact that the Fraudulent Pharmaceuticals dispensed by JMD Pharmacy, Inc. were prescribed pursuant to collusive kickback arrangements and predetermined protocols rather than genuine patient care, the Defendants used preset labels or rubber stamps and/or illegal, pre-printed "prescription order forms" to steer prescriptions to JMD Pharmacy.

74. The labels and stamps contained the names of the Fraudulent Topical Pain Products, including the "coded names" of various Fraudulent Compounded Pain Creams along with their ingredient and quantity formulations. The Prescribing Providers used the preset labels or stamps on their template prescription forms to prescribe the Fraudulent Topical Pain Products, including the Fraudulent Compounded Pain Creams, to Insureds.

75. The "prescription order forms" used by the Defendants contained a "checklist" of products, along with the specific Fraudulent Pharmaceuticals that JMD Pharmacy, Inc. dispensed and the quantity in which they were to be prescribed and dispensed to Insureds.

76. The prescription order forms ensured that the Prescribing Providers would prescribe the specifically targeted Fraudulent Topical Pain Products and steer the prescriptions back to the Defendants so that they could submit egregiously inflated billing to GEICO and other insurers through JMD Pharmacy, Inc.

77. The Prescribing Providers allegedly chose which predetermined product(s) should be prescribed and dispensed to the Insureds by marking off or circling one of the designated boxes on the prescription order forms.

78. New York law prohibits the Defendants from distributing or using a prescription order form, and dispensing pharmaceuticals in response to these types of forms, with multiple drug products, and likewise prohibits the Prescribing Providers from writing prescriptions on these types of forms.

79. As of March 27, 2016, to combat the growing problem of prescription fraud, N.Y. Public Health Law requires that all prescriptions issued in New York State – for both controlled and non-controlled substances – must be prescribed electronically.

80.     In the limited circumstances in which a prescription is excepted from the electronic prescription requirement, N.Y. Public Health Law requires that a written prescription in New York State be written on an official *serialized* New York State prescription blank bearing the prescriber's signature as well as the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.   See, N.Y. Public Health Law § 281, see also N.Y. Education Law § 6810(8).

81.     The prescription order forms are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescription blanks bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.

82.     Moreover, the prescription order forms are invalid and illegal in that New York Education Law prohibits pharmacists from dispensing multiple drugs listed on the same prescription – each prescription medication should be written on its own separate prescription.  Id.

83.     Specifically, New York Education Law § 6810(7) provides as follows:

> "No prescription for a drug written in this state by a person authorized to issue such prescription shall be on a prescription form which authorizes the dispensing or compounding of any other drug. No drug shall be dispensed by a pharmacist when such prescription form includes any other drug."

84.     JMD Pharmacy, Inc. and the other Defendants violated Education Law § 6810(7) by creating, distributing, using, and dispensing against the illegal prescription order forms.

85.     JMD Pharmacy, Inc. used the illegal, invalid, and fraudulent prescriptions with stamps or labels, and the prescription order forms, to bill GEICO and other insurers hundreds of thousands of dollars for the Fraudulent Topical Pain Products.

86.     A sample of the prescriptions issued by the Prescribing Providers using labels or rubber stamps, which JMD Pharmacy, Inc. submitted to GEICO in support of its fraudulent billing, is annexed hereto as Exhibit "2".

87. A sample of the prescription order forms issued by the Prescribing Providers which JMD Pharmacy, Inc. submitted to GEICO in support of its fraudulent billing, is annexed hereto as Exhibit "3".

88. Many of the No-Fault Clinics where the prescriptions originated present themselves to be legitimate healthcare practices when, in fact, they are medical mills that house a "revolving door" of numerous healthcare providers that subject Insureds to as many healthcare good and services as possible in order to exploit their No-Fault Benefits by submitting large volumes of fraudulent claims to No-Fault insurers such as GEICO.

89. For example, GEICO has received billing for purported healthcare services rendered at 2488 Grand Concourse, Bronx, New York from a "revolving door" of over 230 purportedly different healthcare providers.

90. Similarly, GEICO has received billing for purported healthcare services rendered at 3250 Westchester Avenue, Bronx, New York from a "revolving door" of over 180 purportedly different healthcare providers.

91. What is more, certain of the Prescribing Providers and the No-Fault Clinics that were the source of prescriptions steered to JMD Pharmacy, Inc. have been the subject of investigations and lawsuits commenced by various New York insurers with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

92. For example, John Greco, M.D. – the Prescribing Provider who steered the highest amount of Fraudulent Prescription Forms for Fraudulent Pharmaceuticals to JMD Pharmacy, Inc. after it ceased being registered as a licensed pharmacy – was associated with Metro Pain Specialists P.C., a professional corporation that has been named as a defendant in multiple affirmative fraud

cases involving fraudulent services billed to No-Fault insurers, including <u>State Farm Mut. Ins. Co.</u> <u>v. Metro Pain Specialists, P.C., et al</u>, 21-cv-05523 (E.D.N.Y. 10/5/2021) and <u>Allstate Ins. Co. v.</u> <u>Metro Pain Specialists P.C., et al</u>., 21-cv-05586 -DG-RER (E.D.N.Y. 10/7/2021).

93.     In keeping with the fact that Defendants illegally steered the Prescribing Providers and the Clinic Controllers at the No Fault Clinics to provide JMD Pharmacy, Inc. with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols, Insureds were never given the option to use a pharmacy of their choosing.

94.     Instead, the Defendants colluded with the Prescribing Providers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to JMD Pharmacy, Inc., regardless of the distance of this pharmacy from the Insureds or the No-Fault Clinics where they were treating.    In fact, approximately 12% of Insureds who received prescriptions from JMD Pharmacy, Inc. resided in Queens County where JMD Pharmacy, Inc. was located.

95.     Upon information and belief, in most cases, the Fraudulent Pharmaceuticals were purportedly delivered to the Insureds residence or given to Insureds by the front desk staff at the various No-Fault Clinics without the Insured ever seeing the prescription.

96.     In some cases, the Insureds were not even aware that a Fraudulent Pharmaceutical dispensed by JMD Pharmacy, Inc. was prescribed to them until the medication was delivered to their residence or distributed to them by the front desk staff.

97.     As stated above, JMD Pharmacy, Inc. is connected to other pharmacies suspected of engaging in a similar fraud scheme, including JP RX and Maccabi. JP RX and Maccabi have a history of involvement in large scale insurance fraud related to topical pharmaceutical products. <u>See</u> <u>United States of America v. Khaim, et al.</u>, 1:20-cr-00580(AMD)(RML) (E.D.N.Y. 2020) (the

"Khaim litigation"). In the Khaim litigation, the United States Attorney for the Eastern District of New York identified JP RX and Maccabi Pharmacy, among others, as pharmacies secretly owned and controlled by Peter Khaim ("Khaim") and Arkadiy Khaimov and used by them to defraud federal health insurance programs out of millions of dollars by falsely purporting to purchase and dispense a topical drug used with a $34,000.00 average wholesale price. Significantly, "Peter Khaim" appears on the fax header of several bills that were faxed to GEICO on behalf of JMD Pharmacy, Inc.

98.     At times JMD Pharmacy, Inc. and JP RX dispensed products to the same Insureds. Indeed, there are many GEICO Insureds treating at various No-Fault Clinics who were dispensed pharmaceutical products – often in excessive amounts – by both JMD Pharmacy, Inc. and JP RX. For example:

    i.    Insured GC was allegedly involved in a motor vehicle accident on November 16, 2020. On November 23, 2020, GC sought treatment with Metro Pain Specialists, P.C. ("Metro Pain") at a No-Fault Clinic located at 3250 Westchester, Bronx, New York and underwent an examination with John Greco, M.D. ("Dr. Greco") who prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen. On November 24, 2020, JP RX dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to the prescription from Dr. Greco ordered on November 23, 2020. On January 6, 2021, JMD Pharmacy, Inc. dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to a prescription from Dr. Greco ordered on December 30, 2020.

    ii.    Insured DM was allegedly involved in a motor vehicle accident on September 10, 2020. On November 19, 2020, DM sought treatment with Metro Pain at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York and underwent an examination with Dr. Greco who prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen. On November 20, 2020, JP RX dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to the prescription from Dr. Greco ordered on November 19, 2020. On January 4, 2021, JMD Pharmacy, Inc. dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to a prescription from Dr. Greco ordered on December 29, 2020.

iii.  Insured RH was allegedly involved in a motor vehicle accident on September 27, 2020. On October 22, 2020, RH sought treatment with Metro Pain at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York and underwent an examination with Dr. Greco who prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen. On October 26, 2020, JP RX dispensed Diclofenac Sodium Gel 3% (not mentioned in Dr. Greco's treatment notes) to this Insured pursuant to a prescription from Greco ordered on October 22, 2020. On January 4, 2021, JMD Pharmacy, Inc. dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to a prescription from Dr. Greco ordered on December 29, 2020.

iv.  Insured DR was allegedly involved in a motor vehicle accident on October 3, 2020. On October 7, 2020, DR sought treatment with Metro Pain at a No-Fault Clinic located at 3250 Westchester, Bronx, New York and underwent an examination with Dr. Greco who prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen. On November 11, 2020, JP RX dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to the prescription from Dr. Greco ordered on October 7, 2020. On December 29, 2020, JMD Pharmacy, Inc. dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to a prescription from Dr. Greco ordered on December 21, 2020.

v.  Insured AA was allegedly involved in a motor vehicle accident on October 23, 2020. On October 29, 2020, AA sought treatment with Metro Pain at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York and underwent an examination with Dr. Greco who prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen. On November 2, 2020, JP RX dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to the prescription from Dr. Greco ordered on October 29, 2020. On December 3, 2020, JP RX again dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to a prescription from Dr. Greco ordered on December 1, 2020. On January 7, 2021, JMD Pharmacy, Inc. dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to a prescription from Dr. Greco ordered on January 5, 2021.

vi.  Insured CL was allegedly involved in a motor vehicle accident on October 23, 2020. On October 29, 2020, CL sought treatment with Metro Pain at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York and underwent an examination with Dr. Greco who prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen. On November 2, 2020, JP RX dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%,

cyclobenzaprine, and naproxen to this Insured pursuant to the prescription from Dr. Greco ordered on October 29, 2020. On December 3, 2020, JP RX again dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to a prescription from Dr. Greco ordered on December 1, 2020. On January 7, 2021, JMD Pharmacy, Inc. dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to a prescription from Dr. Greco ordered on January 5, 2021.

vii.   Insured MS was allegedly involved in a motor vehicle accident on November 1, 2020. On November 4, 2020, MS sought treatment with Metro Pain at a No-Fault Clinic located at 3250 Westchester, Bronx, New York and underwent an examination with Dr. Greco who prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen. On November 5, 2020, JP RX dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to the prescription from Dr. Greco ordered on November 4, 2020. On January 6, 2021, JMD Pharmacy, Inc. dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to a prescription from Dr. Greco ordered on January 4, 2021.

viii.  Insured WE was allegedly involved in a motor vehicle accident on November 12, 2020. On December 9, 2020, WE sought treatment with Metro Pain at a No-Fault Clinic located at 3250 Westchester, Bronx, New York and underwent an examination with Dr. Greco who prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen. On December 10, 2020, JP RX dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to the prescription from Dr. Greco ordered on December 9, 2020. On January 20, 2021, JMD Pharmacy, Inc. dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to a prescription from Dr. Greco ordered on January 18, 2021.

ix.    Insured JP was allegedly involved in a motor vehicle accident on October 16, 2020. On November 19, 2020, JP sought treatment with Metro Pain at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York and underwent an examination with Dr. Greco who prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen. On November 20, 2020, JP RX dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to the prescription from Dr. Greco ordered on November 19, 2020. On January 4, 2021, JMD Pharmacy, Inc. dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to a prescription from Dr. Greco ordered on December 31, 2020.

       x.    Insured CV was allegedly involved in a motor vehicle accident on October 25, 2020. On October 27, 2020, CV sought treatment with Metro Pain at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York and underwent an examination with Dr. Greco who prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen. On November 1, 2020, JP RX dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to the prescription from Dr. Greco ordered on October 27, 2020. On January 4, 2021, JMD Pharmacy, Inc. dispensed Lidocaine 5% Ointment, Pennsaid External Solution 2%, cyclobenzaprine, and naproxen to this Insured pursuant to a prescription from Dr. Greco ordered on December 29, 2020.

99.    The Defendants spearheaded their pharmaceutical fraud scheme involving the Prescribing Providers and the Clinic Controllers knowing that (i) the Fraudulent Pharmaceuticals were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care; (ii) the Defendants dispensed and billed for Fraudulent Pharmaceuticals after JMD Pharmacy, Inc. ceased being registered as a licensed pharmacy; (iii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to JMD Pharmacy, Inc., in exchange for unlawful kickbacks and other financial incentives; (iv) the Defendants engaged in illegal bulk compounding by having JMD Pharmacy, Inc. specialize in producing and dispensing large quantities of compounded pain creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault benefits; (v) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and dispensed in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and (vi) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent

Pharmaceuticals under the name of JMD Pharmacy, Inc. pursuant to illegal, invalid, and duplicitous prescriptions.

**B.     The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care to Exploit Patients for Financial Gain**

100.    In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, the Insureds treated by the Prescribing Providers at No-Fault Clinics associated with Clinic Controllers – and who received pharmaceuticals from JMD Pharmacy, Inc.– were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

101.    Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an NSAID for the initial management of pain. NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

102.    Clinical studies of FDA-approved topical NSAIDs have shown them to be no more effective than placebo for treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries) in superficial locations.

103.    More recently, in 2019 the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such

pain should be treated using an *individualized, multimodal approach which may include prescription medications depending on various biological, psychological and social factors of an individual patient*, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., NSAIDs) should be used as first line therapy for patients for whom medications are clinically appropriate.

104.    Despite these guidelines and the basic goal of helping patients get better in a timely fashion, the Prescribing Providers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that the healthcare providers at the No-Fault Clinics purported to render to Insureds as part of a predetermined protocol that failed to include any individualized treatment whatsoever.  These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products such as the Fraudulent Topical Pain Products dispensed.

105.    To the extent any examination was performed at all, the Prescribing Providers often failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals. Alternatively, the Prescribing Providers inaccurately documented the patients' medical histories, including any current medications the patients were taking at the time of the examination.

106.    Prescribing a multitude of pharmaceutical drug products without first taking a detailed, and accurate, patient history demonstrates a gross indifference to patient health and safety as the Prescribing Providers often do not know whether the patient is currently taking any

medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

107.    The Prescribing Providers also did not document in their examination reports whether the patients were intolerant of oral medications necessitating a prescription for a Fraudulent Topical Pain Product.

108.    The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to patients and dispensed by JMD Pharmacy, Inc. were actually used by the patients.

109.    The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals provided any pain relief to the patients or were otherwise effective for the purpose prescribed.

110.    At times, the Prescribing Providers failed to document in any of their examination reports that the patient even received a Fraudulent Pharmaceutical.

111.    At times, the Prescribing Providers documented a different Fraudulent Pharmaceutical than that which was actually prescribed and dispensed to the patient.

112.    The Prescribing Providers' failure to properly document which Fraudulent Pharmaceuticals were prescribed to their patients and the patients' reactions to those pharmaceuticals demonstrates a complete disregard for patient health and safety.

113.    In addition, the Prescribing Providers often recommended Insureds continue taking oral NSAIDs (e.g., ibuprofen and naproxen) and/or prescribed oral NSAIDs contemporaneous to prescribing Fraudulent Compounded Pain Creams or Non-Compounded Pain Creams containing NSAIDS, which is known as therapeutic duplication. Therapeutic duplication can cause adverse

events to the patient and very often leads to emergency room visits because the use of more than one medication in the same class of drugs exacerbates the possible adverse side effects.

114.    Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

### 1.    The Fraudulent Compounded Pain Creams

115.    As part of their fraudulent, profit-driven scheme, the Defendants submitted or cause to be submitted, hundreds of thousands of dollars in claims for medically unnecessary, ineffective Fraudulent Compounded Pain Creams.

116.    Compounded products are not FDA-approved, and therefore, not subject to FDA regulations regarding quality, safety, and effectiveness of manufactured drug products.

117.    Because of limited evidence to support their efficacy, compounded products should never be prescribed as a matter of routine therapy and should only be prescribed to meet a legitimate specific need of an individual patient, or when all other forms of oral and/or topical medications approved for the treatment of pain have failed.

118.    Prior to receiving a prescription for any compounded drug product, a patient's medical records should document all other forms of FDA-approved drugs that were prescribed and failed to treat the symptom for which the compounded drug product was then prescribed, and/or the medical rationale that supports the otherwise premature prescription of a compounded drug product.

119.    From February 2017 through November 2017, JMD Pharmacy, Inc. dispensed and billed for Fraudulent Compounded Pain Creams, which are not approved by the FDA, in set

formulations, without tailoring the medications to the individual needs of any individual patient, and without complying with licensing requirements that are designed to ensure the quality, safety and effectiveness of bulk compounded drug products.

120. To generate profits, JMD Pharmacy, Inc. intentionally produced and dispensed the Fraudulent Compounded Pain Creams without regard for the absence of any proven topical efficacy of the combination of ingredients.

121. The Defendants submitted exorbitant charges for the Fraudulent Compounded Pain Creams knowing that the topical efficacy of the products JMD Pharmacy, Inc. produced and dispensed was unproven, and that there was a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost.

122. The Defendants knew that there was no legitimate medical need for the Fraudulent Compounded Pain Creams that could explain why a commercially available drug product alone would not be appropriate for the patients who were instead prescribed and dispensed the exorbitantly priced Fraudulent Compounded Pain Creams, often in addition to such commercially available products.

123. The Defendants, solely to maximize profits, used JMD Pharmacy, Inc. to specialize in illegal compounding, producing large quantities of compounded drugs in set formulations, to compound and dispense specially marked, formulaic prescriptions.

124. The Defendants then entered into collusive arrangement with the Clinic Controllers and Prescribing Providers in which they provided them with kickbacks or other financial incentives in exchange for fraudulent, illusory prescriptions for the Fraudulent Compounded Pain Creams.

125. Notwithstanding the Defendants' attempt to conceal the scheme and present JMD Pharmacy, Inc. as a neighborhood pharmacy, the Defendants directly violated New York State and

Federal regulatory and licensing requirements that govern large-scale drug compounders, drug manufacturers and outsourcing facilities and which prohibit collusive arrangements for compounding and/or dispensing of coded or specially marked prescriptions.

126.    The Fraudulent Compounded Pain Creams produced and dispensed by JMD Pharmacy, Inc.: (i) were not medically necessary; (ii) contained a combination of ingredients that was nonsensical and had no proven efficacy, or that produced no significant difference between the compounded drug and comparable commercially available products; (iii) were almost never prescribed properly under the governing regulations; and (iv) were "prescribed" and produced in large quantities without regard for medical necessity or the regulations governing the appropriate use of compounded drug products, as part of collusive arrangements with the Prescribing Providers and Clinic Controllers.

127.    In short, the Fraudulent Compounded Pain Creams produced by JMD Pharmacy, Inc., and prescribed by the Prescribing Providers, served no purpose other than to exploit Insureds' No-Fault Benefits to financially benefit the Defendants.

> **2.     JMD Pharmacy, Inc. Specialized in Large Scale Drug Compounding Activity in Violation of New York State and Federal Law Governing Drug Manufacturers and Outsourcing Facilities**

128.    As stated above, in order to facilitate the prescription of the Fraudulent Compounded Pain Creams, and to steer the Prescribing Providers and Clinic Controllers to direct those prescriptions to JMD Pharmacy, Inc., the Defendants often provided the Prescribing Providers and Clinic Controllers with preset labels or rubber stamps which contained the names of the Fraudulent Compounded Pain Creams and the designated formulations, including the names of the particular drug ingredients and percentage concentrations of each ingredient used. The Prescribing Providers then used these stamps or labels on their official New York State prescription pads to prescribe the Fraudulent Compounded Pain Creams to the Insureds.

129.   For example, as shown on Defendants' billing submissions to GEICO, the Defendants produced and dispensed, among others, the following predetermined, formulaic, coded Fraudulent Compounded Pain Cream:

- "BCFGLM Cream" (also coded as "Compound RX 218N") containing the following ingredients in the following quantities:

  o   MENTHOL 3.6 GRAMS
  o   FLURBIPROFEN 36 GRAMS
  o   LIDOCAINE HCL 18 GRAMS
  o   BACLOFEN 7.2 GRAMS
  o   CYCLOBENZAPRINE 7.2 GRAMS
  o   GABAPENTIN 28.8 GRAMS

130.   The Defendants typically billed GEICO between $3,971.76 and $4,306.82 for a single tube of "BCFGLM Cream."

131.   Despite the fact that, according to the FDA, traditional pharmacy compounding requires the combining, mixing, or altering of ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription, the preset prescription labels and rubber stamps – created by the Defendants and distributed to the Prescribing Providers and Clinic Controllers – indicate that the Defendants created predetermined compounded drug products and produced them in bulk.

132.   Additionally, by including both Baclofen and Cyclobenzaprine – two different muscle relaxers – in every preformulated tube of BCFGLM Cream, the Defendants engaged in therapeutic duplication whereby they unnecessarily increased the risk of adverse events to Insureds that purportedly received the Fraudulent Compounded Pain Creams.

133.   The Fraudulent Compounded Pain Creams were not created or prescribed by the Prescribing Providers to meet the unique needs of any individual patient.

134.   Rather, the Fraudulent Compounded Pain Creams were produced and dispensed by JMD Pharmacy, Inc. in large quantities without regard for the unique needs of any individual patient.

135.   By supplying the Prescribing Providers and Clinic Controllers with the preset prescription labels and rubber stamps, the Defendants steered the Prescribing Providers and Clinic Controllers to prescribe, or caused to be prescribed, the Fraudulent Compounded Pain Creams in large volumes and direct those prescriptions to JMD Pharmacy, Inc. in exchange for kickbacks or other financial incentives.

136.   The Defendants never cited a legitimate medical need for the Fraudulent Compounded Pain Creams that explained why a commercially available drug product was not appropriate to dispense to the Insureds who received the Fraudulent Compounded Pain Creams.

137.   Likewise, the Prescribing Providers never cited a legitimate medical need for the Fraudulent Compounded Pain Creams that explained why a commercially available drug product was not appropriate to prescribe to the Insureds who received the Fraudulent Compounded Pain Creams.

138.   For example, the Prescribing Providers never indicated the patient had a contraindication to commercially available drug product or that the patient was failing to improve with the use of commercially available drug products, nor did they document any medication allergies or pre-existing comorbidity that may support the use of a Fraudulent Compounded Pain Cream.

139.   Accordingly, the Fraudulent Compounded Pain Creams, prescribed by the Prescribing Providers, and produced by the Defendants, were never customized for individual

patients.  Rather the same Fraudulent Compounded Pain Creams were repeatedly prescribed and dispensed to hundreds of insureds.

140.    JMD Pharmacy, Inc., by specializing in creating and dispensing large volumes of the Fraudulent Compounded Pain Creams, engaged in bulk compounding activity (akin to that engaged in by drug manufacturers and outsourcing facilities) as opposed to compounding individual prescriptions on a case-by-case basis upon receipt of a valid prescription order.

141.    In the ten months that JMD Pharmacy, Inc. illegally operated as a drug manufacturer of compounded pain creams, it billed GEICO alone in excess of $425,000.00 for the Fraudulent Compounded Pain Creams it created, produced and dispensed pursuant to the duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers.

142.    GEICO makes up only a fraction of the New York automobile insurance market, therefore, JMD Pharmacy, Inc. likely billed all New York automobile insurers more than three times the amount billed to GEICO.

143.    The Defendants' creation and dispensation of predetermined, compounded drug products in large volumes, renders JMD Pharmacy, Inc. in violation of both state and federal licensing laws regulating the safe manufacturing of drugs. See 21 U.S.C. § 355 and 21 U.S.C. 353a(a).

144.    Furthermore, by acting akin to drug manufacturers and dispensers, the Defendants violated 21 U.S.C. § 355(a) which states that "no person shall introduce or deliver for introduction into interstate commerce any new drug" without first obtaining approval to do so by way of an application filed with the Secretary with respect to that drug.

145.    A "new drug" – as defined by 21 U.S.C. § 321(p)(1) – is "any drug…the composition of which is such that such drug is not generally recognized…as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling thereof."

146.    JMD Pharmacy, Inc.'s Fraudulent Compounded Pain Creams – for which it billed GEICO alone nearly a half a million dollars – were never FDA-approved and, therefore, were never verified by the FDA as being safe, effective or quality products.

### 3.    The Prescription and Dispensation of JMD Pharmacy, Inc.'s Fraudulent Compounded Pain Creams Was Contrary to Evidenced-Based Medical Practices

147.    In keeping with the fact that the Fraudulent Compounded Pain Creams were prescribed pursuant to the Defendants' fraudulent scheme intended to generate profits from insurers, JMD Pharmacy, Inc.'s Fraudulent Compounded Pain Creams (i) have no medical efficacy based on the purported symptoms of the patients receiving the compounded products, and (ii) were prescribed without any legitimate reason to provide the patients with expensive compounded products – which include drugs whose efficacy in topical form is undocumented and unsupported – when there are many other widely accepted, proven effective alternatives with well-documented therapeutic benefits commercially available at considerably lower costs.

148.    Topical compounded pain creams should be the last prescribed intervention, after oral medications are not tolerated or are deemed ineffective or contraindicated, as well as after any FDA-approved manufactured topical products have been shown to provide no pain relief to the patient.

149.    For a topical formulation to be effective, it must first penetrate the skin.  In general, creams are less effective than gels or sprays.

150.    The skin is composed of three layers: epidermis, dermis, and hypodermis.  Within the epidermis, the stratus corneum is the outermost layer of the skin that serves as the main barrier

to drug entry.  For analgesic medicines to be absorbed through the skin, they must contain optimal drug combinations, effective concentrations of each drug, and a compounding base with the appropriate physiochemical properties to facilitate absorption.

151.    For a drug to alleviate pain, it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

152.    Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated – those with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease or congestive heart failure).

153.    JMD Pharmacy, Inc.'s Fraudulent Compounded Pain Creams contain combinations of drugs that make no clinical sense and have no efficacious value in treating musculoskeletal and neuropathic injuries – even assuming the Insureds the Prescribing Providers treated suffered from such injuries.

154.    There are no published, peer-reviewed, controlled studies to support that patients who suffer from musculoskeletal pain or neuropathy have achieved any therapeutic effect from using topical pain creams containing the drugs that are part of the Fraudulent Compounded Pain Creams.

155.    Further, many of the Fraudulent Compounded Pain Creams are available in alternative oral formulations or are commercially available in different topical formulations for a fraction of the cost.

156. The alternatives to the Fraudulent Compounded Pain Creams, whether in oral formulations or commercially available topical formulations, have proven to therapeutically benefit patients suffering from pain, are FDA-approved, and are commonly prescribed by healthcare providers who utilize evidence-based medicine for their prescribing practices.

157. The Prescribing Providers also continuously failed to document in their examination reports why any compounded drug product was medically necessary, or why the Fraudulent Compounded Pain Cream they ultimately prescribed for the patient was medically necessary.

158. Specifically, although compounded drugs should not be prescribed as a matter of routine therapy, but rather should only be prescribed when there is a legitimate need for a uniquely tailored medication or there is documented evidence that all other forms of oral and/or topical medications approved for the treatment of pain have failed, the Prescribing Providers and Clinic Controllers routinely prescribed, or caused to be prescribed, a Fraudulent Compounded Pain Cream upon initial examination. For example:

i. Insured ES was allegedly involved in a motor vehicle accident on June 22, 2017. ES sought treatment at a No-Fault Clinic located at 3857 Kings Highway, Brooklyn, NY, and on July 7, 2017 underwent an initial examination with Kathy Aligene, M.D. ("Dr. Aligene") of Pain Medicine of NY, P.C. ("Pain Medicine NY"). At the time of the initial examination, Dr. Aligene did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on July 11, 2017, JMD Pharmacy, Inc. dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Aligene upon initial examination on July 7, 2017.

ii. Insured CB was allegedly involved in a motor vehicle accident on December 22, 2016. CB sought treatment at a No-Fault Clinic located at 3857 Kings Highway, Brooklyn, NY, and on August 25, 2017 underwent an examination with Dr. Aligene of Pain Medicine NY. At the time of the examination, Dr. Aligene did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on August

29, 2017, JMD Pharmacy, Inc. dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Aligene upon initial examination on August 25, 2017.

iii.     Insured AW was allegedly involved in a motor vehicle accident on August 3, 2017. AW sought treatment at a No-Fault Clinic located at 3857 Kings Highway, Brooklyn, NY, and on August 11, 2017 underwent an initial examination with Dr. Aligene of Pain Medicine NY. At the time of the initial examination, Dr. Aligene did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on August 24, 2017, JMD Pharmacy, Inc. dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Aligene upon initial examination on August 21, 2017.

iv.     Insured AW was allegedly involved in a motor vehicle accident on September 30, 2016. AW sought treatment at a No-Fault Clinic located at 3857 Kings Highway, Brooklyn, NY, and on July 17, 2017 underwent an examination with Dr. Aligene of Pain Medicine NY. At the time of the examination, Dr. Aligene did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on July 20, 2017, JMD Pharmacy, Inc. dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Aligene upon initial examination on July 17, 2017.

v.     Insured JS was allegedly involved in a motor vehicle accident on October 14, 2015. JS sought treatment at a No-Fault Clinic located at 2277-83 Coney Island Avenue, Brooklyn, NY, and on January 31, 2017 underwent an initial examination with Leonid Reyfman, M.D. ("Dr. Reyfman") of LR Medical, PLLC ("LR Medical"). At the time of the initial examination, Dr. Reyfman did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on February 22, 2017, JMD Pharmacy, Inc. dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Reyfman upon initial examination on January 31, 2017.

vi.     Insured TS was allegedly involved in a motor vehicle accident on August 6, 2017. TS sought treatment at a No-Fault Clinic located at 3857 Kings Highway, Brooklyn, NY, and on August 18, 2017 underwent an initial examination with Dr. Aligene of Pain Medicine NY. At the time of the initial examination, Dr. Aligene did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on August 29, 2017, JMD Pharmacy, Inc. dispensed and billed for a Fraudulent

Compounded Pain Cream pursuant to a prescription issued by Dr. Aligene upon initial examination on August 18, 2017.

vii.   Insured TM was allegedly involved in a motor vehicle accident on June 30, 2017. TM sought treatment at a No-Fault Clinic located at 3857 Kings Highway, Brooklyn, NY, and on July 7, 2017 underwent an initial examination with Dr. Aligene of Pain Medicine NY. At the time of the initial examination, Dr. Aligene did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on August 7, 2017, JMD Pharmacy, Inc. dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Aligene upon initial examination on July 7, 2017.

viii.   Insured YM was allegedly involved in a motor vehicle accident on July 8, 2017. YM sought treatment at a No-Fault Clinic located at 3857 Kings Highway, Brooklyn, NY, and on August 4, 2017 underwent an initial examination with Dr. Aligene of Pain Medicine NY. At the time of the initial examination, Dr. Aligene did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on August 29, 2017, JMD Pharmacy, Inc. dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Aligene upon initial examination on August 4, 2017.

ix.   Insured KC was allegedly involved in a motor vehicle accident on February 2, 2017. KC sought treatment at a No-Fault Clinic located at 3857 Kings Highway, Brooklyn, NY, and on September 1, 2017 underwent an examination with Dr. Aligene of Pain Medicine NY. At the time of the examination, Dr. Aligene did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on September 8, 2017, JMD Pharmacy, Inc. dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Aligene upon initial examination on September 6, 2017.

x.   Insured BE was allegedly involved in a motor vehicle accident on June 29, 2017. BE sought treatment at a No-Fault Clinic located at 3857 Kings Highway, Brooklyn, NY, and on July 7, 2017 underwent an initial examination with Dr. Aligene of Pain Medicine NY. At the time of the initial examination, Dr. Aligene did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on August 7, 2017, JMD Pharmacy, Inc. dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Aligene upon initial examination on July 7, 2017.

159.    The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Compounded Pain Cream prescribed to a particular patient was actually used by the patient.

160.    The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Compounded Pain Cream provided any pain relief to the patient or was otherwise effective for the purpose prescribed.

161.    At times, the Prescribing Providers failed to document in any of their examination reports that the patient even received a Fraudulent Compounded Pain Cream or documented a different Fraudulent Compounded Pain Cream than what was actually prescribed to the patient, and dispensed and billed by the Defendants.

162.    The Prescribing Providers plainly and continuously failed to prescribe individually tailored compounded products, made for an identified individual Insured, which produced a significant difference between the compounded drug and a comparable commercially available FDA-approved product.

163.    Likewise, JMD Pharmacy, Inc. never dispensed individually tailored compounded products, made for an identified individual Insured, which produced a significant difference between the compounded drug and a comparable commercially available product.

164.    The combination of drugs used in the Fraudulent Compounded Pain Creams was merely a means for the Defendants to inflate their billing and maximize their charges to exploit New York automobile insurance carriers, as pharmacy providers are ordinarily statutorily reimbursed for each individual ingredient contained in a compounded drug product.  As a result, the more drug ingredients that JMD Pharmacy, Inc. included in its Fraudulent Compounded Pain Creams, the more the Defendants could bill under the name of JMD Pharmacy, Inc.

### 4.      The Fraudulent Lidocaine Ointment and Pennsaid Solution Prescriptions

165.     In accordance with the fraudulent scheme discussed above, after JMD Pharmacy, Inc. ceased its illegal operation as a manufacturer of the Fraudulent Compounded Pain Creams, it routinely billed GEICO for exorbitantly priced Non-Compounded Fraudulent Topical Pain Products exclusively in the form of Lidocaine 5% Ointment ("Topical Lidocaine") and Pennsaid External Solution 2% (a diclofenac product), along with naproxen and cyclobenzaprine, pursuant to prescriptions solicited from Prescribing Providers and Clinic Controllers in exchange for kickbacks or other financial incentives.

166.     As to the Topical Lidocaine, the Defendants solicited the Prescribing Providers and the Clinic Controllers to provide them with voluminous prescriptions for this product because the Defendants could readily buy Topical Lidocaine at low cost but bill GEICO and other New York No-Fault insurers through JMD Pharmacy, Inc. for huge sums based on egregiously high wholesale prices.

167.     Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin.  Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

168.     Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

169.     Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison

sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

170.     Despite this, the Prescribing Providers never recommended Insureds first use over-the-counter Lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents.

171.     For example, the Prescribing Providers never recommended insureds first try Icy Hot Lidocaine (which contains 4% lidocaine) or other similar OTC lidocaine products available at most well-known pharmacy retailers at a mere fraction of the cost.

172.     Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers routinely prescribed Insureds Lidocaine 5% Ointment and directed the prescriptions to JMD Pharmacy, Inc.

173.     Notwithstanding the most common uses for Topical Lidocaine, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe Topical Lidocaine, while also recommending the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs – in the form of Naproxen – and other Fraudulent Pharmaceuticals including Pennsaid External Solution 2% and Cyclobenzaprine.

174.     Prescribing Topical Lidocaine, while simultaneously prescribing or recommending the patient take oral NSAIDs, is therapeutic duplication which results in increased risk with no additional therapeutic benefit.

175.     Likewise, the Defendants solicited the Prescribers and the Clinic Controllers to provide them with voluminous prescriptions for Pennsaid External Solution 2% because the Defendants could readily buy Pennsaid External Solution 2% at low cost but have JMD Pharmacy,

Inc. bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

176.    Pennsaid External Solution 2% (a diclofenac product) is an NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

177.    Notwithstanding the most common uses for Pennsaid External Solution 2%, or the risks associated with the drug, the Defendants steered the Prescribers to prescribe diclofenac sodium in the form of Pennsaid External Solution 2% while recommending the patient continue the use of oral NSAIDs and other Fraudulent Topical Pain Products such as Topical Lidocaine, naproxen, and cyclobenzaprine.

178.    Prescribing Pennsaid External Solution 2%, while simultaneously prescribing and dispensing oral NSAIDS to patients, is therapeutic duplication which results in increased risk with no additional therapeutic benefit.

179.    Nevertheless, the Prescribing Providers consciously prescribed and the Pharmacy Defendants consciously dispensed Topical Lidocaine and Pennsaid External Solution 2% in conjunction with oral NSAIDs and/or Fraudulent Topical Pain Products to numerous Insureds, thereby engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being.  For example:

    i.    Insured DF was allegedly involved in a motor vehicle accident on October 24, 2020. DF sought treatment with Metro Pain at a No-Fault Clinic located at 3250 Westchester, Bronx, NY, and underwent an examination with Dr. Greco on December 23, 2020. Dr. Greco prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, Cyclobenzaprine, and Naproxen. These prescriptions were dispensed and billed by JMD Pharmacy, Inc. on December 29, 2020.

    ii.    Insured JB was allegedly involved in a motor vehicle accident on December 5, 2020. JB sought treatment with Metro Pain at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, NY, and underwent an examination with Dr. Greco

on December 29, 2020. Dr. Greco prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, Cyclobenzaprine, and Naproxen. These prescriptions were dispensed and billed by JMD Pharmacy, Inc. on January 4, 2021.

iii.   Insured AM was allegedly involved in a motor vehicle accident on November 7, 2020. AM sought treatment with Metro Pain at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, NY, and underwent an examination with Dr. Greco on December 29, 2020. Dr. Greco prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, Cyclobenzaprine, and Naproxen. These prescriptions were dispensed and billed by JMD Pharmacy, Inc. on January 4, 2021.

iv.   Insured LO was allegedly involved in a motor vehicle accident on October 28, 2020. LO sought treatment with Metro Pain at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, NY, and underwent an examination with Dr. Greco on January 5, 2021. Dr. Greco prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, Cyclobenzaprine, and Naproxen. These prescriptions were dispensed and billed by JMD Pharmacy, Inc. on January 7, 2021.

v.   Insured AO was allegedly involved in a motor vehicle accident on August 14, 2020. AO sought treatment with Metro Pain at a No-Fault Clinic located at 3250 Westchester, Bronx, NY, and underwent an examination with Dr. Greco on December 28, 2020. Dr. Greco prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, Cyclobenzaprine, and Naproxen. These prescriptions were dispensed and billed by JMD Pharmacy, Inc. on December 29, 2020.

vi.   Insured RT was allegedly involved in a motor vehicle accident on October 13, 2020. RT sought treatment with Metro Pain at a No-Fault Clinic located at 3250 Westchester, Bronx, NY, and underwent an examination with Dr. Greco on January 18, 2021. Dr. Greco prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, Cyclobenzaprine, and Naproxen. These prescriptions were dispensed and billed by JMD Pharmacy, Inc. on January 20, 2021.

vii.   Insured IC was allegedly involved in a motor vehicle accident on September 10, 2020. IC sought treatment with Metro Pain at a No-Fault Clinic located at 3250 Westchester, Bronx, NY, and underwent an examination with Dr. Greco on December 28, 2020. Dr. Greco prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, Cyclobenzaprine, and Naproxen. These prescriptions were dispensed and billed by JMD Pharmacy, Inc. on December 29, 2020.

viii.   Insured KH was allegedly involved in a motor vehicle accident on November 9, 2020. KH sought treatment with Metro Pain at a No-Fault Clinic located at 3250 Westchester, Bronx, NY, and underwent an examination with Dr. Greco on December 21, 2020. Dr. Greco prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, Cyclobenzaprine, and Naproxen. These prescriptions were dispensed and billed by JMD Pharmacy, Inc. on December 29, 2020.

ix.     Insured GR was allegedly involved in a motor vehicle accident on October 31, 2020. GR sought treatment with Metro Pain at a No-Fault Clinic located at 3250 Westchester, Bronx, NY, and underwent an examination with Dr. Greco on December 28, 2020. Dr. Greco prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, Cyclobenzaprine, and Naproxen. These prescriptions were dispensed and billed by JMD Pharmacy, Inc. on December 29, 2020.

x.      Insured AS was allegedly involved in a motor vehicle accident on October 31, 2020. AS sought treatment with Metro Pain at a No-Fault Clinic located at 3250 Westchester, Bronx, NY, and underwent an examination with Dr. Greco on December 28, 2020. Dr. Greco prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, Cyclobenzaprine, and Naproxen. These prescriptions were dispensed and billed by JMD Pharmacy, Inc. on December 29, 2020.

**C.     The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among JMD Pharmacy, Inc., the Prescribing Providers and the Clinic Controllers**

180.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

181.    New York's statutory framework also specifically prohibits collusive arrangements between licensed physicians and pharmacies involving compounded or specially marked prescriptions. See N.Y. Education Law § 6530(38) and § 6811(7).  In fact, New York Education Law § 6811(7) makes such agreements criminal.

182.    Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then to have those prescriptions directed to JMD Pharmacy, Inc. so that the Defendants could bill GEICO huge sums.

183.     In furtherance of the scheme, the Prescribing Providers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

184.     In keeping with the fact that the Fraudulent Pharmaceuticals dispensed by JMD Pharmacy, Inc. were prescribed pursuant to collusive arrangements and predetermined protocols rather than genuine patient care, the Defendants supplied preset labels or rubber stamps as well as Fraudulent Prescription Forms to certain Prescribing Providers containing the various Fraudulent Pharmaceuticals that JMD Pharmacy, Inc. dispensed.

185.     Specifically, the preset labels and rubber stamps contained the names of the Fraudulent Topical Pain Products, including the "coded names" of various Fraudulent Compounded Pain Creams along with their ingredient and quantity formulations.  The Prescribing Providers then used the preset labels or stamps on their template prescription forms to prescribe the Fraudulent Topical Pain Products, including the Fraudulent Compounded Pain Creams, to Insureds.

186.     Furthermore, the Fraudulent Prescription Forms ensured that the Prescribing Providers would prescribe predetermined Fraudulent Topical Pain Products, which JMD Pharmacy, Inc. could then bill for at egregiously inflated rates.

187.     JMD Pharmacy, Inc.'s Fraudulent Prescription Forms are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescriptions bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.

188.     The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that (i) the Fraudulent Pharmaceuticals were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care; (ii) the Defendants dispensed and billed for Fraudulent Pharmaceuticals after JMD Pharmacy, Inc. ceased being registered as a licensed pharmacy; (iii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to JMD Pharmacy, Inc., in exchange for unlawful kickbacks and other financial incentives; (iv) the Defendants engaged in illegal bulk compounding by having JMD Pharmacy, Inc. specialize in producing and dispensing large quantities of compounded pain creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault benefits; (v) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and dispensed in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and (vi) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of JMD Pharmacy, Inc. pursuant to illegal, invalid, and duplicitous prescriptions.

189.     The Defendants, in collusion with the Prescribing Providers and Clinic Controllers, made sure that the Insureds never had the option to use a pharmacy of their own choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to JMD

Pharmacy, Inc., notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were located in counties far from JMD Pharmacy, Inc. in Queens County and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

190.     JMD Pharmacy, Inc. purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, without the patient ever receiving the actual written prescription and, in many cases, without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

191.     Alternatively, the Insureds were given the Fraudulent Pharmaceuticals by the front desk staff at the various No-Fault Clinics, again without ever seeing the actual prescription or, in many cases, not even knowing that they were to receive a Fraudulent Pharmaceutical.

192.     The Defendants, the Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by JMD Pharmacy, Inc., and to ensure that the Defendants benefitted financially from the prescriptions.

193.     The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

194.     The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to JMD Pharmacy, Inc. rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

195.     The Defendants, the Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including using JMD Pharmacy, Inc.'s Fraudulent Prescription Form as well as the preset labels and rubber stamps,

intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to JMD Pharmacy, Inc., unless they profited from their participation in the illegal scheme.

196.    But for the payments of kickbacks, or other financial incentives (such as employment at a No-Fault Clinic), the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, including the Fraudulent Compounded Pain Creams, and would not have directed the prescriptions to JMD Pharmacy, Inc.

197.    The Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

198.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by JMD Pharmacy, Inc.

199.    Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

**D.    The Fraudulent Billing and Collection By Defendants**

200.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

201.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the

drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

202.    The maximum amount a healthcare provider may charge for a medically necessary prescription drug or product is based upon the drug's NDC number. With respect to compounded products, the maximum a healthcare provider may charge is based on each individual ingredient included in the compounded product and their corresponding NDC numbers and AWPs.

203.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

204.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

205.    AWP is defined by 12 N.Y.C.R.R. § 440.2(a) as:

> "[t]he average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health or any successor publisher, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee."

206.    When a pharmacist bills for dispensing prescription drugs (including compounded products), it must bill based on the actual NDC number (and the assigned AWP) for that drug or compound drug ingredient.  It cannot use the NDC of the same ingredient available from a different supplier and/or purchased in different quantities in order to inflate the assigned AWP.

207.    The Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the pre-determined, formulaic Fraudulent

Compounded Pain Creams because the more ingredients contained in a compounded drug product, the more charges the Defendants may submit through JMD Pharmacy, Inc. for dispensing the product.

208.    The Defendants produced and dispensed the Fraudulent Compounded Pain Creams – which were produced in bulk by compounding multiple drug ingredients in nonsensical combinations with no proven efficacy – in order to inflate JMD Pharmacy, Inc.'s billing and maximize their profits.

209.    Likewise, the Defendants solicited the Clinic Controllers and the Prescribing Providers to provided them with voluminous prescriptions for the Non-Compounded Fraudulent Topical Pain Products (i.e., Lidocaine 5% Ointment and Pennsaid External Solution 2%) because the Defendants could readily buy these Fraudulent Topical Pain Products at low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

210.    The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate JMD Pharmacy, Inc.'s billing and maximize their profits.

211.    The Defendants purported to provide the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, directly to GEICO Insureds, and sought reimbursement directly from GEICO pursuant to executed "Assignment of Benefit" ("AOB") forms.

212.    In support of their charges, the Defendants typically submitted: (i) the Prescribing Providers' prescription forms; (ii) a "No-Fault" form, known as an NF-3 Form, which included the purported NDC numbers, units, and corresponding charges for each drug product or ingredient; (iii) an itemized invoice which included the Insureds' demographics, dates the prescription was

purportedly filled, the purported NDC numbers, units, and corresponding charges, and the name of the Prescribing Provider; and (iv) the executed AOB assigning the Insureds' benefits to the Defendants.

213.    Moreover, the Defendants never submitted their wholesale purchase invoices demonstrating (i) how much the Defendants actually paid the supplier for the Fraudulent Pharmaceuticals, including the ingredients contained in the Fraudulent Compounded Pain Creams, and (ii) whether the Defendants actually purchased the Fraudulent Pharmaceuticals or the ingredients contained in the Fraudulent Compounded Pain Cream under the particular NDC numbers used in the billing, representing purchases from a particular supplier in a particular quantity.

214.    With respect to the Fraudulent Pharmaceuticals, JMD Pharmacy, Inc. never actually paid the "average wholesale price" of the products it dispensed or purported to dispense, and in particular never paid the targeted and egregious average wholesale price for the Fraudulent Topical Pain Products, because it is not a true representation of actual market price and is far above the actual acquisition cost of the drug products themselves.

215.    Nevertheless, the Defendants billed GEICO and other No-Fault insurers egregious amounts far surpassing both their actual acquisition costs as well as the costs of a wide variety of other medications that are FDA-approved and proven effective.

216.    Further, upon information and belief, JMD Pharmacy, Inc. often did not actually purchase topical pain products with the particular NDC number used in the billing, and instead purchased topical pain products from different suppliers and/or in different quantities but nonetheless used the NDC number in their billing that generated the highest reimbursement amount in order to inflate the Defendants' profits.

217.     Notwithstanding the clear evidence of fraud, JMD Pharmacy, Inc. and its successors in interest, with the assistance of the John Doe Defendants Nos. 1-5., continue to seek collection on the fraudulent billing.

218.     In fact, though Defendants transferred away the pharmacy license of JMD Pharmacy, Inc., Defendants created two successors in interest to continue the fraud: to wit, APP Pharmacy, Inc. d/b/a JMD Pharmacy and APRX Pharmacy Inc. d/b/a JMD Pharmacy.

219.     APP Pharmacy, Inc. d/b/a JMD Pharmacy and APRX Pharmacy Inc. d/b/a JMD Pharmacy, as successors in interest to JMD Pharmacy, Inc. are responsible for the conduct and liabilities of JMD Pharmacy, Inc. and, upon information and belief, have been used by the other Defendants to further the fraud and continue collection on the fraudulent billing.

220.     The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers, whether those charges were billed under the name JMD Pharmacy, Inc., JMD Pharmacy, or JMD Rx.  These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers, typically under the name of JMD Pharmacy, Inc. as plaintiff, if the charges are not promptly paid in full.

221.     The Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that JMD Pharmacy, Inc. and the other Defendants have been engaged in fraud.

**V.      The Defendants' Submission of Fraudulent NF-3 Forms to GEICO**

222.     To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of JMD Pharmacy, Inc. seeking payment for pharmaceuticals for which JMD Pharmacy, Inc. is ineligible to receive.

223.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submit or cause to be submitted to GEICO, are false and misleading in the following material respects:

i.      The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

ii.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants dispensed and billed for Fraudulent Pharmaceuticals after JMD Pharmacy, Inc. ceased being registered as a licensed pharmacy;

iii.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous and illegal prescriptions to JMD Pharmacy, Inc. and/or its successors in interest, for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

iv.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that they engaged in illegal bulk compounding by producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering JMD Pharmacy, Inc. and its successors in interest ineligible to receive reimbursement for No-Fault Benefits;

v.     The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and

vi.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions.

## VI.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

224.    The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

225.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

226.    Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants dispensed and billed for Fraudulent Pharmaceuticals after JMD Pharmacy, Inc. ceased being registered as a licensed pharmacy; (iii) the Defendants were involved in collusive kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies; (iv) the

Defendants engaged in illegal bulk compounding by producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements; (v) the Defendants intentionally targeted the Fraudulent Topical Pain Products that they acquired at low cost and dispensed in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and (vi) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of JMD Pharmacy, Inc. pursuant to illegal, invalid, and duplicitous prescriptions.

227.    The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee.

228.    The Defendants also created multiple entities, and used multiple variations of the name "JMD Pharmacy" in order to conceal their scheme and limit scrutiny of the volume and nature of billing being submitted.

229.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

230.    In accordance with the No-Fault Laws, GEICO either: (i) timely denied the pending claims for No-Fault Benefits submitted through JMD Pharmacy, Inc.; (ii) timely issued requests for additional verification with respect to the pending claims for No-Fault Benefits submitted through JMD Pharmacy, Inc. yet failed to obtain complete compliance with those requests; or else (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through JMD Pharmacy, Inc. or to request additional verification of those claims, has not yet expired.

231.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $377,000.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

232.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### THE FIRST CLAIM FOR RELIEF
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

233.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

234.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $800,000.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through JMD Pharmacy, Inc. and its successors in interest.

235.    JMD Pharmacy, Inc. and its successors in interest have no right to receive payment for any pending bills submitted to GEICO because Defendants billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care.

236.     JMD Pharmacy, Inc. and its successors in interest have no right to receive payment for any pending bills submitted to GEICO because JMD Pharmacy, Inc. dispensed and billed for Fraudulent Pharmaceuticals after JMD Pharmacy, Inc. ceased being registered as a licensed pharmacy.

237.     JMD Pharmacy, Inc. and its successors in interest have no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships, in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to JMD Pharmacy, Inc. and/or its successors in interest, in exchange for unlawful kickbacks and other financial incentives.

238.     JMD Pharmacy, Inc. and its successors in interest have no right to receive payments for any pending bills submitted to GEICO because the Defendants engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault Benefits.

239.     JMD Pharmacy, Inc. and its successors in interest have no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and dispensed in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

240.     JMD Pharmacy, Inc. and its successors in interest have no right to receive payment for any pending bills submitted to GEICO because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted

charges for the Fraudulent Pharmaceuticals under the name of JMD Pharmacy, Inc., or similar variations of that name, pursuant to illegal, invalid, and duplicitous prescriptions.

241.    The Defendants, including JMD Pharmacy, Inc., violated New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

242.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants, including JMD Pharmacy, Inc. and its successors in interest, have no right to receive payment for any pending bills submitted to GEICO.

## THE SECOND CLAIM FOR RELIEF
### Against Soni
### (Violation of RICO, 18 U.S.C. § 1962(c))

243.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

244.    JMD Pharmacy, Inc. is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

245.    Soni knowingly conducted and/or participated, directly or indirectly, in the conduct of JMD Pharmacy, Inc.'s affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over nineteen months, seeking payments that JMD Pharmacy, Inc. was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants dispensed and billed for

Fraudulent Pharmaceuticals after JMD Pharmacy, Inc. ceased being registered as a licensed pharmacy; (iii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to JMD Pharmacy, Inc. in exchange for unlawful kickbacks and other financial incentives; (iv) the Defendants engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault Benefits; (v) the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (vi) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of JMD Pharmacy, Inc. and similar variations of that name pursuant to illegal, invalid, and duplicitous prescriptions.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

246.    JMD Pharmacy, Inc.'s business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Soni operated JMD Pharmacy, Inc., inasmuch as JMD Pharmacy, Inc. was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for JMD Pharmacy, Inc. to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued

criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through JMD Pharmacy, Inc. to the present day.

247.    JMD Pharmacy, Inc. is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals, including Fraudulent Compounded Pain Creams; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants.  These inherently unlawful acts are taken by JMD Pharmacy, Inc. in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

248.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid greater than $377,000.00 pursuant to the fraudulent bills submitted by the Defendants.

249.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), and any other relief the Court deems just and proper.

**THE THIRD CLAIM FOR RELIEF**
**Against All Defendants**
**(Common Law Fraud)**

250.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

251.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of JMD.

252. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that JMD Pharmacy, Inc. acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants dispensed and billed for Fraudulent Pharmaceuticals after JMD Pharmacy, Inc. ceased being registered as a licensed pharmacy; (iii) in every claim, the representation that JMD Pharmacy, Inc. acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to JMD Pharmacy, Inc. in exchange for unlawful kickbacks and other financial incentives; (iv) in every claim, the representation that JMD Pharmacy, Inc. acted in accordance with materials licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact JMD Pharmacy, Inc. engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements; (v) in every claim, the representation that JMD Pharmacy, Inc. acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1)

and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (vi) in every claim, the representation that JMD Pharmacy, Inc. acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of JMD Pharmacy, Inc. pursuant to illegal, invalid, and duplicitous prescriptions.

253.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through JMD Pharmacy, Inc. that were not compensable under the No-Fault Laws.

254.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $377,000.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through JMD Pharmacy, Inc.

255.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

256.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FOURTH CLAIM FOR RELIEF
### Against All Defendants
### (Unjust Enrichment)

257.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

258.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

259.    When GEICO paid the bills and charges submitted by or on behalf of JMD Pharmacy, Inc. for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

260.    The Defendants, including JMD Pharmacy, Inc., Ronika Soni, APP Pharmacy, Inc. d/b/a JMD Pharmacy, APRX Pharmacy Inc. d/b/a JMD Pharmacy, and John Doe Defendants Nos. 1-5, have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

261.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

262.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $377,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Defendants have no right to receive payment for any pending bills, amounting to approximately $800,000.00 in charges submitted to GEICO;

B.      On the Second Claim For Relief against Soni, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $377,000.00 together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.      On the Third Claim For Relief against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $377,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

D.      On the Fourth Claim for Relief against the Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $377,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       June 20, 2022

                    RIVKIN RADLER LLP

                    By:    /s/ *Michael A. Sirignano, Esq.*
                         Michael A. Sirignano
                         Barry I. Levy
                         Jennifer Abreu
                         Vincent J. Pontrello
                  926 RXR Plaza
                  Uniondale, New York 11556
                  (516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*